The next case on our docket is the Oklahoma Police Pension and Retirement System v. PlayAGS, Inc. Counsel, come forward. Okay. If the panelists are ready, you may come forward. Good morning. Jeffrey A. Dubbin for Appellant. May it please the Court, I'd reserve five minutes for rebuttal. I'd like to begin with the procedural error below. The District Court allowed two Rule 12 motions against the same complaint, contrary to Rule 12's plain text and structure, this Court's precedent and Rule 1's direction to interpret the rules for judicial efficiency and fairness. Firming the procedure below would open the floodgates of litigation, muddy up this Court's precedent, and multiply the expense of bringing any claim to federal court. Fortunately, Rule 12H2 says directly that the failure to state a claim in defense can be raised only once against the same complaint. I'd like to add to what's in the briefs by pointing out Rule 12H2 doesn't mention Rule 12B6. It says the failure to state a claim in defense may be raised in a Rule 7 pleading, in a Rule 12C motion, or at trial. Or, of course, we do argue it's disjunctive, it means only once out of those three scenarios, and it's clear from the absence of mention of Rule 12B, which, of course, is an opportunity to raise the argument that the complaint fails to state a claim, that what the drafters of the Rule are explicitly contemplating here is that that defense was omitted from that previous motion. That's exactly the way. Yes? I just had a question. It seems like the District Court dismissed your claims for failure to prosecute, and I don't think I saw anywhere in your briefings where you have challenged that ruling. And so I guess I'd just ask you, why do you think the District Court abused its discretion in making that decision? No, Your Honor, that's why the District Court denied us leave to amend after dismissing the scheme claim. It was because we made the intentional decision not to amend after dismissal of everything but the scheme claim in the first motion. Now, that decision that we made... Yes, I realize that's what I was asking about. Right, of course. We were facing an order that made manifest errors of law when it granted Defendants 12 v. 6 motion, despite being told what the right law was. However, it did let the scheme claim through by denying the motion with respect to that. It also allowed all the CWs who support that claim as well-pled. It seemed like it was the best that we were going to do at the time, and frankly, in retrospect, still does, especially given what we know now about the order of judgment on the pleading. So with regard to leave to amend, he did reach that ruling. We think it's an error, but it's not related to the Rule 12 issue. So I guess I'm not appreciating, what is the egregious procedural mistake that the District Court made? It allowed two Rule 12 motions against the same complaint. First, under Rule 12 v. 6, which it denied with regard to the scheme claim. Then it allowed Defendants a second opportunity to move to dismiss the scheme claim. On the judgment on the pleading. Under judgment on the pleading, once again asserting only the same identical argument, failure to state a claim on which relief can be granted. Now, Rule 12 does not allow that, and this Court's precedent does not allow that. In the Apple decision, it read Rule 12h specifically, we cite this in our brief, as saying that the failure to state a claim defense can be raised, only if not brought, previously under Rule 12b. And this Court's alphabet decision did not allow Defendants a second Rule 12 motion against a scheme claim that their Rule 12 motion failed to target on the merits. Here, appellees filed three simultaneous Rule 12 v. 6 motions. None targeted the scheme on the merits. There was, of course, that solitary footnote based on abrogated law, which did not address the merits. And that done, it was reversible error to give appellees a second chance to argue that the same complaint failed to state a claim. They should have brought those arguments in their first motion. See Rule 12 g. 2. Now here, without that second motion below, the scheme claim would still stand. Rightfully so. This Court should reinstate it because of the procedural error. And with it, this Court should reinstate the claim against Apollo and the Executive Defendants for controlling the scheme. This is Claim 2. The first order below should never have dismissed the control person claim against Apollo, particularly not after assuming as true the facts of control, which the Apollo and Executive Defendants below did not contest and continue not contesting on appeal. So given the manifest procedural error below regarding Rule 12, we think that it should result in Claims 1 with regard to the scheme and Claim 2 with regard to control person allegations being reinstated. Switching to the merits, I'd like to augment the briefs a little bit by just taking a step back and discussing PlayAGS's business in general. 95% of its business is leasing slot machines to casinos, which create revenue according to the laws of probability and how good are PlayAGS's terms with those casinos? And that is measured by RPD. So the company's two main value propositions to investors are how good is the RPD and how fast can the footprint grow without sacrificing RPD because it's easy to see how the company could temporarily grow its footprint by letting casinos lock in better terms, which makes future RPD drop inevitably, and the company has no way out unless it jettisons those bad leases disadvantageously. As pled, investors believed PlayAGS's growth was genuine and not at the expense of RPD, and that impression was based on Apelli's actions, omissions, and statements. So Counselor, you're under Rule 9b and the heightened pleading requirements for fraud, correct? Yes. Let me actually get into my question. I only really saw two more specific allegations here that jumped out at me from the complaint. One of them was about the internal growth projections and what led to, I guess, like an internal McKinsey study that then led to something that went to some investors. And then secondly, an allegation about certain fourth quarter sales being moved over to the first quarter of the following year, you know, 400 units. Apart from those two, I was struggling to try to find specific allegations that linked to alleged false or misleading public statements. Can you clarify? Yes, Your Honor, and so first of all, with regard to those facts, I think they are much broader than that, more detailed than that. It's not only projections which were multiplied, but all of the on-the-ground data that supported those projections is the allegation given to us by reliable CW-12. Furthermore, with regards to sales being stolen from future quarters and moved into previous quarters, the allegation is not simply that it happened that one time, January of 2019 to December of 2018. That is one specific example provided by two different CWs. But as a matter of fact, the multiple CWs... But what about the growth projections link that up to what specific public statements were known at the time and intentionally false or misleading? The growth projections specifically, Your Honor, is the fact, it's the deceptive or manipulative act supporting the scheme liability allegation under Rule 10b, 5a, and c. It is not specifically one of the reasons why any particular false or misleading statement, any particular statement during the class period was false or misleading. However, I will say it does support the allegation under... This is our claim 3 and 4 under the Securities Act that when these SPOs happened, the offering documents pursuant to which Apollo's shares were flooded into the market were required to disclose any known trends or uncertainties. And the absence of a materially known trend or uncertainty from those documents is recoverable under the Securities Act. This is a different claim that we make, and we allege that the arbitrary multiplying of internal goals as well as this procedure where the company... How did that manifest in public is what I'm trying to get at. So I take it you're not leaning so much into Rule 10b false statements, and it's more of a fraud scheme liability theory, but how did that manifest to harm the public? It's both of those, Your Honor. Well, I haven't heard you mention a specific public statement, and I've asked three times. A specific public statement, I would like to address that. When Lopez says every quarter, this is the number of units we added this quarter, but what he knows because he was personally involved in moving those units from future quarters into the quarter he was reporting financial results for is that they weren't genuine. Those units that he reported as quarterly growth, and the allegation is every quarter, not just that December to January quarter, but every single one that he was not only personally involved at that point, but he was in meetings where this was discussed every quarter of the class period. This is alleged in paragraphs 125 to 130 of the complaint. CW12 at paragraph 129 says that it happened each quarter and that it was done at the behest of the senior vice presidents and Lopez himself. CW5 also alleges each quarter. That's paragraphs 129 to 130. And, of course, there's CW6. Are those sufficient for a Rule 9b or a heightened analysis that it's just generally every quarter some things were moved over sales from one to the next? Is that enough in general? CW6 says that it was done as an illusion. That these sales were not genuine. They did not happen in the quarter in which the defendants were saying they were happening, and this was to give the appearance of faster growth, which matters to investors, but it was a false appearance. Now, if we transport ourselves to the end of the class period where the news is, and this is as soon as Apollo finishes the second SPO unloading its shares, revenue growth and unit growth and RPD did not lightly taper off. They ceased immediately. They went from growing, growing, growing to growing 30%, 40%, greater and greater and greater to zero. And RPD went from this large and growing number to actually not just stopping but shrinking. This is consistent with a three-pronged pump-and-dump scheme catching up with the company, not... Am I correct that Lopez and Acuona, I hope I'm pronouncing that right, did not sell any of their own stock during the class period? No, Your Honor, that fact is not in evidence anywhere. It was reversible error for the district court to say so in its order. This is a complete violation of what this court said clearly in the Orexogen case, which is that defendants are not entitled to just come up with their own facts based on nothing in the record, not even judicial notice, nothing at all. And it's completely contrary. It's to contradict the well-put allegation that the motive was to satisfy Apollo's sale of stock for great benefit and Apollo controlled the plague, yes, in this matter. Can I ask you to please address our court's recent ruling in Pirani versus Slack? It seems like our circuit has now clarified that stock tracing is a required element for stating a Section 11 and a Section 12a claim. And so I'm curious as to why is that case not dispositive of your statutory standing argument here? That was the law of the circuit even before Pirani, Your Honor, and my client lead plaintiff's standing for the second SPO, which we agree he didn't purchase directly pursuant to, is irrelevant at the pleading stage where this court's decision in Melendrez and its later interpretation of that in the Nunez case says clearly that a lead plaintiff doesn't need standing on every claim that he's going to bring. It's only a matter of whether they adequately represent the rest of the class. Melendrez says once he has standing on his own claims, and he does, we allege very clearly that he directly purchased in the first SPO from defendant appellee Deutsche Bank Securities for the offering price, paying no commission, meaning it was a direct. And I see my time's running low. I would like to still reserve some time for rebuttal. But Melendrez makes clear that that's the end of the inquiry for standing, constitutional or statutory, and the Nunez case applies it to statutory standing. That's this court's decision, and it's cited in the brief. So that being the case, it's simply to bring these additional claims is something this, my client's appointed by the court as the lead plaintiff of a consolidated action. It has no choice but to bring its claims as they come, and it's not required to have standing on every claim. If somebody else who does have statutory standing on the second SPO were to file that claim, it would be consolidated with this case, and my client would still be the court-appointed lead plaintiff. And Congress says the lead plaintiff is appointed by having the largest damages, not by having statutory standing on each possible claim. So there's really no other way for this claim to be brought, and I don't see Parani as having any problem with this being assessed at the class certification stage. Do you want to reserve the balance of your time? Yes, please, Your Honor. Thank you.  May it please the court, Genevieve York-Irwin from Baker-Hostetler for the defendants' appellees. Plaintiffs have raised an expansive list of issues on appeal, but this is simply a distraction from the fact that this is a fundamentally flawed case. It was originally a simple false forecast case based on the second quarter of 2019 guidance reduction. Over time, plaintiffs' theory has become untethered from that stock drop and morphed into a years-long pump-and-dump scheme that simply doesn't make sense. No 10b defendant is alleged to have dumped any stock or has any other personal financial motive for the alleged fraud. No facts suggest that AGS was financially struggling prior to the second quarter of 2019, and the steady growth that AGS saw confirmed by audited financials that have never been restated for years leading up to the second quarter of 2019 is totally inconsistent with the idea that it was struggling and trying to hide it. Judge Mahan's decision below on the motions to dismiss saw this and dismissed appropriately. Let's talk about this a little bit because your friend across the aisle is saying there were manifest procedural errors regarding Rule 12. Can you address that? Of course. So Rule 12H2 explicitly permits defendants to challenge the sufficiency of the pleadings at any time up to and including trial, and it identifies a pleading under Rule 7, a Rule 12C motion, or at trial. The district court's first opinion didn't decide whether the scheme claim had been adequately pleaded. He's very clear about that in his second opinion. That was plaintiff's theory in arguing below, but it was rejected appropriately by the district court because the district court clearly said in that second opinion at the record, page 3 to 4, that he hadn't decided that issue because he felt it was insufficiently briefed. And so in those circumstances, it was totally appropriate, and it actually facilitated the just and speedy administration of the case for the court to hear and decide a Rule 12C motion rather than force the court and the litigants to litigate that claim, the only remaining claim in the case. In Ray Alphabet and Apple are not to the contrary. In Ray Alphabet merely reversed a sua sponte dismissal of a scheme claim that the defendants had failed to target on their 12B motion. I have another procedural question. I wanted to ask how were the defendants prejudiced by the plaintiffs' failure to amend the complaint after the court's December, I think, 2022 dismissal without prejudice? Because the plaintiffs asked to amend the complaint a couple months later in their February, I think it was, 2023 response to the motion for judgment on the pleadings. So I'm just trying to figure out, weren't all the dismissed defendants still aware that there was a chance they could remain in the lawsuit if the plaintiffs were given another chance to amend the complaint? I don't know that the defendants suffered specific prejudice on that point. I think the issue is more that plaintiffs had every opportunity to amend this. I think that when the district court dismissed on the motion to dismiss, it seemed clear in that opinion that he contemplated additional briefing on all of these issues that he expected repleting and that the scheme claim would be sorted out in subsequent motions to dismiss. And he, when plaintiff chose not to take that opportunity, he appropriately concluded that it seemed like they didn't have anything more to add at that point, that they chose not to, they chose to pursue the scheme claim instead, and that the appropriate course at that point was to dismiss with prejudice. Another question I had is it seems like an argument has been presented that you cannot be held liable under Section 12A2 because defendants were not statutory sellers. It seems like this whole case is about stock that is being sold on behalf of Apollo, so I'm just trying to figure out what's your best case that says that company putting stock up for sale does not meet the definition of a statutory seller. So Pinter v. Dahl is the authority on who is a statutory seller for these purposes, and Pinter outlines two different ways where you can be a statutory seller. One is by passing title, or you can also be a statutory seller if you successfully solicited the plaintiff's purchases. Here there's a conclusory allegation that one underwriter passed title, and that's Deutsche Bank, but there are no facts pled in support of that. They don't allege whether a plaintiff purchased from Deutsch directly or whether it did so through a broker or a third party, as is often the case, and there are no allegations as to any other defendant passing title specifically. There are also only conclusory allegations with respect to the solicitation prong under Pinter. The underwriters are alleged to merely have participated. They assisted with due diligence, and they helped prepare offering materials. Mere participation under Pinter is not enough to be a statutory seller, and the conclusory allegations for both the Apollo defendants and the AGS defendants are also insufficient. AGS is alleged to have issued and signed the registration statement, but that is not sufficient to establish the relationship that the statutory seller requirement is directed at, which is supposed to be a much more direct relationship. I had another question. You heard me ask your friend across the aisle to address the Perani case and the impact on the plaintiffs here. He has redirected me to Melendrez. What's your response to that? I agree that I don't believe SLAC changes the landscape for these purposes, that the plaintiff is required to sufficiently allege statutory standing with respect to both the Section 11 and Section 12 claims, but I don't. And our position is that they haven't done so, but that with respect to the March 2019 SPO, for the August 2018 SPO, they have alleged that they can trace their purchases to that offering. But is it your view that a lead plaintiff has to have statutory standing for every single claim that might arise under the class? Yes. And does SLAC say that? I don't believe SLAC addressed that, but INRAE Aluminum, in this circuit, does say that you are required to be able to trace your purchase to the particular offering at issue. Which I guess counsel would say they do as to one of the offerings. And so why isn't that enough to establish statutory standing for that plaintiff as to that claim, but also leading the class as to other claims? Well, INRAE Century Aluminum says it's not, and I think the reason that makes sense is because Congress enacted the Section 11 and Section 12 regimes with strict liability. And so it narrowly circumscribed who was allowed to sue on those. It's not just anybody, but you have to actually be able to trace to the particular offering, and part of that is that is an appropriate limitation given the stricter liability being applied to the defendants in those cases. So when you pick who's going to be the lead plaintiff, you have to make sure now every time that you are traceable to each of the alleged claims, that somehow you were affected by that? I think that, yes, that you only have standing with respect to offerings that you actually can trace your purchase to. And the only cases that they've cited in opposition to that are constitutional or Article III standing cases. You know, there's nothing, we're not aware of any authority that goes against INRAE Century Aluminum on that point. So if that is the case, then we're limited, in your view, to that August 18, I guess, 2018? They only have statutory standing to assert that claim, although we believe that none of the defendants are alleged to have been statutory sellers for either of the SPOs. Maybe I can address quickly confidential witnesses. The position here is that there are none of the usual red flags for fraud here. No smoking gun, internal documents, no financial restatements, no motive. Instead, their case is built entirely on a handful of confidential witnesses whom the district court correctly concluded either lacked personal knowledge or whose allegations were insufficient to show contemporaneous falsity. I'm sure you're getting there, but it would be helpful to me if you could go right to Confidential Witness 12, and particularly this allegation about Lopez asking consultants to leave the room and then telling everyone, you know, make the numbers higher. So if you look at those Confidential Witnesses 12 allegations, all he really says with respect to Lopez is that he said that's too low with respect to the growth projections that CW12 had prepared. And the complaint itself in footnote 2 actually explains that what CW12 had done was a bottom-up analysis with respect to growth projections. That's different from a top-down analysis, right? A bottom-up analysis was looking at internal sales data and trying to build, based on that, forward-looking projections. But the complaint acknowledges that there are other ways to analyze growth projections, including a top-down analysis, which presumably is what, you know, is referring to that. I'm not sure. So why does that matter? If it's a different type of analysis, why does that somehow fail the heightened pleading standards? I think that the question here, especially with respect to Sienter, is whether holistically it makes sense. There's a cogent and compelling inference. I mean, as I understand it, through a bottom-up analysis, there's a certain amount of sales projections, this person's in lead of sales teams, and then he gets into a meeting and he alleges or she alleges that Lopez says that's not enough, and suddenly you see this quadrupling of those sales, which indicates manipulation. Why isn't that specific enough on a heightened pleading basis? I think, respectfully, we don't believe it does suggest manipulation. We think that it suggests that he genuinely believed that the projections were too low. You know, he was looking at projections and believed that they didn't accurately represent the anticipated growth for the company in his kind of larger position. And as I believe came up earlier, there is no allegation that those sales projections were ever made public, right, that they ever found their way into the marketplace in a way that would have impacted the stock price or that would allow plaintiffs to show the market relying on them. I'm glad you raised that. I wanted to ask about that because it did exit the company. It was external to the company. I guess the package that was developed went outside the company. Why isn't that sufficient to be public? Well, I actually don't agree that it's alleged that it did. I think there's only a conclusory allegation that CW12 saw a packet that he thought was being sent to the underwriters. He doesn't allege any basis for knowing anything about that. And I don't believe there's anything sufficiently particular with respect to how that information might have impacted the market. I believe Coach Sanchez had also raised the CW11's allegations with respect to sales movement at the end of quarters. I would like to point out that CW5 and CW6 are to also speak to having asked customers to change the sales dates that had been originally scheduled. But that strongly suggests that the movements we're talking about here, or the changes to the sales dates, were done with customer permission, in which case it's not manipulative or deceptive, or at least certainly isn't sufficiently alleged that it is. What those CWs indicate is that it was actually done with customer consent, in which case I don't see how that renders any of the quarterly results that were shared during the class period, false or misleading, or how it could possibly show a manipulative act or scienter for the individual. And the only 10 B defendants whose mental state matters are AGS, Defendant Lopez, and Defendant Acuón. And what about CW12, the allegation that 400 units were moved from one court to the next? Is it unclear whether customers might have consented to that or not? I believe CW11 actually makes that allegation. I'm sorry, CW11. And CW11 is very vague both as to that CW's role in the company. It just says they were a senior sales employee. The district court, I think, correctly concluded that those CW allegations from CW11 didn't even satisfy Zucco's threshold requirement of having personal knowledge of the things that CW alleged. But in any case, I think reading CW11's allegations with 5 and 6's allegations, that the practice of sometimes asking customers to move sales was done with the customer's consent, I think strongly suggests that there was nothing nefarious going on there. I think we have a lot of nefarious sounding allegations here that when you dig into them are not actually nefarious. I'll just add again that with respect to scienter, there are only two CW's who allege any interaction at all with Mr. Acuón or Mr. Lopez. That's CW5 who says that he attended meetings with them where asking customers to change sale dates was discussed. And then CW12, the allegations that we mentioned already of pre-IPO meetings, which we submit, do not show any deceptive conduct. We think that's just an executive exercising his prerogative to say I don't agree with these projections. I guess I just want, before you again understand your best argument, why there was no statutory seller. No statutory seller. So we believe all of those allegations are conclusory, effectively. That they are insufficiently particular, but that they fail even Rule 8's standard. That the solicitation that is alleged is conclusory and also behind the scenes. That it's not directed at actual buyers. Thank you. Thank you. Your Honor, most importantly, there's going to be a sea change in law if we're not too careful here. Because CW allegations are not entitled to be scrutinized according to this higher level under Silicon Graphics and Zucco. And Forescout this course entire line of cases for scheme claims or for Securities Act violations. Even those that sound in fraud. And my colleague is asking for that without citing a single case where this court has ever done it. No, as a matter of fact, every single case where this court has performed that level of scrutiny on CW allegations. Or with respect to 10b-5b misstatement allegations. So insofar as all of these facts support these other claims for scheme and for violation of the Securities Act. CW allegations simply have to be taken as true. And the reason for this is because all allegations have to be taken as true. Except PSLRA B-1 says only for allegations that a false and misleading statement is made under this chapter. And this chapter means the Exchange Act. It provides three extra requirements for what has to happen. Raising the pleading standard. Congress knows how to raise a pleading standard. And it only did for 10b-5b misstatements. It says specify the statement, the reasons why they're false and misleading. And if you're pleading on a basis, you need to provide your reasons for that basis. And that PSLRA B-1 is cited in every single one of this court's decisions. Raising the standard and scrutinizing CWs that way. It has only ever applied that level of scrutiny to 10b-5b statements precisely because they're raised only for B-1. But we still apply heightened Rule 9b requirements. Even if you're right that the PSLRA doesn't apply to the fraud scheme claims, we still apply heightened fraud allegation requirements. The claims have to be pled with particularity, yes. But the CW allegations have to be taken as true. Rule 9 applies in many cases other than false and misleading statements under the Securities Act or fraud scheme claims under the Exchange Act. There are many other fraud cases that this court, I hope, is not intending to all of a sudden also raise the pleading standard for. Everywhere Rule 9b applies, just regard variety fraud cases. The allegations don't get any additional scrutiny there, nor here in scheme places, nor here in Securities Act places. And I would direct this court to its opinion in Nolenberg v. Harmonic, where it actually was facing both 12b-5b misstatements and Securities Act claims. It had the same CW allegation regarding that the company knew that its sales were declining as a result of the announcement of a merger. It did not take that fact as true in rejecting the 10b-5b claims, but it did take that fact as true in reversing dismissal of Securities Act claims, actually the same Securities Act claims as here, Section 11, Section 12a-2. And it's of no moment that claims may or may not sound in fraud. That's just a different thing. And Congress could have said, any claim that sounds in fraud could have written PSLRA b-1 differently and said any claim that sounds in fraud has to meet these three extra higher pleading standards, but it didn't. It only said false and misleading statements under this chapter, meaning the Exchange Act, which means Rule 10b-5b statements. And this is part of the error below because in the judgment on the pleadings order, the district court said that the standards are equal between schemes and misstatements, and it was wrong. We told him about PSLRA b-1. We told him that he has to evaluate it differently under the lower standard, but he did not evaluate the allegations. He simply said my previous order on false and misleading statements necessarily and logically requires dismissal of the scheme. And he also got the elements of the scheme wrong, and I think that this case presents an important opportunity for this court to articulate the six elements of a Rule 10b-5a or c, deceptive or manipulative act or scheme or practice or course of business or artifice or device to defraud, along the lines that we suggest in the briefs, which my colleagues agree should be the six elements. But the district court got wrong. It had four elements. They were not the same as it should be, and this court should take advantage of this opportunity to clarify the law. Thank you. Thank you very much. Thank you, Mr. Dubbin and Ms. York-Irwin. We appreciate your oral argument presentations today. The case of Oklahoma Police Pension and Retirement System v. Play AGS, Inc. is submitted. We're going to take a brief recess of 10 minutes and then return for the next argument. Thank you. We'll be in recess. All rise.
judges: MURGUIA, SANCHEZ, THOMAS